1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOHNATHON E. TAYLOR, | ) | 1:09-cv-01219-SKO |
| | ) | |
| | ) | **ORDER REGARDING PLAINTIFF'S** |
| Plaintiff, | ) | **SOCIAL SECURITY COMPLAINT** |
| | ) | |
| v. | ) | (Doc. 1) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
|_____ | ) | |

## **BACKGROUND**

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act").  42 U.S.C. § 405(g).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 10, 13.)  On April 7, 2010, the action was reassigned to the Honorable Sheila K. Oberto for all purposes.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; *see also* L.R. 301, 305.

# FACTUAL BACKGROUND

Plaintiff was born in 1979, has a tenth-grade education, and has only worked previously for two weeks at a car wash. (Administrative Record ("AR") 157, 159, 164, 899, 900.) On October 7, 1999, Plaintiff filed an application for SSI alleging disability beginning September 10, 1999, due to seizures, a mental disorder, and borderline IQ. (AR 26, 157.)

## A.   Medical Evidence

On September 20, 1999, Plaintiff was a pedestrian involved in an accident with a motor vehicle. (AR 28, 283, 295, 315, 325.) Plaintiff was nineteen years old at the time and was taken to the University Medical Center Emergency Room in Fresno for treatment. (AR 325.) Plaintiff suffered injuries to his right femur, which required surgical placement of a rod into Plaintiff's leg. (AR 273, 283-84, 302.) Plaintiff also suffered a left epidural hematoma, which required neurosurgery and temporary placement of an intracranial monitoring bolt. (AR 273-74, 279, 288, 292-96.) Plaintiff was discharged on October 6, 1999, after a sixteen-day hospitalization. (AR 273.) Follow-up rehabilitation took place through December 1999 at Valley Children's Hospital. (AR 275, 319-26.)

Lynne Reinfurt, Ph.D., conducted a psychological evaluation of Plaintiff on March 30, 2000, after Plaintiff was referred by the Department of Social Services Disability Evaluation Division. (AR 337-40.) Dr. Reinfurt interviewed Plaintiff, who told the doctor that he had been drinking heavily and smoking marijuana in the previous two years. (AR 337.) Plaintiff also told the doctor that he "had some problems with the law," including an arrest for being a passenger in a stolen car, and several outstanding warrants. (AR 337.) Dr. Reinfurt observed that Plaintiff's speech was slow but coherent, marked by poor grammar and constricted vocabulary, and his posture was slumped. (AR 338.) Several tests were administered by Dr. Reinfurt, including the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III"), the Bender Visual Motor Gestalt Test ("Bender-Gestalt Test"), and the Wechsler Memory Scale III ("WMS-III"). (AR 338.) WAIS-III testing results established that Plaintiff's Verbal IQ was 69, his Performance IQ was 76, and his Full Scale IQ was 70. (AR 338.) These scores indicated, in Dr. Reinfurt's opinion, that Plaintiff was within the

2

intellectual functioning range of "Mildly Deficient to Borderline." (AR 338.) For the Bender-Gestalt Test, Dr. Reinfurt observed that Plaintiff's test results fell within the normal range. (AR 339.) For the WMS-III, Dr. Reinfurt opined that Plaintiff's memory score of 53 was deficient and "slightly lower than would be [predicted] from the IQ score," but Plaintiff's score on the Working Memory Index was "quite strong" at 80. (AR 338.) Dr. Reinfurt concluded that Plaintiff would be able to "recall and implement simple instructions," that Plaintiff would not do well in "a workplace that is fast-paced, loosely structured, or demanding of social adeptness," and recommended that Plaintiff attend rehabilitation sessions and vocational training. (AR 339.) Dr. Reinfurt made no Axis II Diagnosis; for Axis I, she diagnosed a probable premorbid language disorder, an unspecified cognitive disorder, and depression due to brain injury.[2] (AR 339.)

Plaintiff was assaulted near his mother's house on December 31, 2000, when he was struck on the left side of his head. (AR 28, 378, 384, 935-38.) Because Plaintiff's mother was concerned about his welfare, Plaintiff immediately went to live with his sister in Reno, Nevada. (AR 938.) Following the assault, Plaintiff suffered expressive dysphagia and was brought to the Washoe Medical Center Emergency Room in Reno on January 3, 2001. (AR 378-79.) After being diagnosed with a small left hemorrhagic contusion, Plaintiff stayed in the hospital until January 9, 2001, for observation. (AR 389, 456.) Plaintiff worked with a speech therapist in the hospital and attended outpatient speech therapy after being discharged. (AR 456, 462-82.)

At the request of Plaintiff's attorney, a psychological evaluation of Plaintiff was conducted by Valerie Forward, Ph.D., during December 2001 and January 2002. (AR 365-71.) Dr. Forward noted that during her interviews with Plaintiff he had slow, soft speech with poor grammar and a limited vocabulary. (AR 366.) Plaintiff had a lethargic and depressed demeanor with slumped posture and poor eye contact. (AR 366.) Dr. Forward noted that Plaintiff said he helped around the house with basic chores, housekeeping, and cooking. (AR 367.) Multiple tests were administered

---

[2] The Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") uses a multiaxal diagnostic system based on five dimensions. Axis I describes clinical syndromes. Axis II describes personality disorders and mental retardation. Axis III describes general medical conditions. Axis IV describes psychosocial and environmental problems. Axis V describes a global assessment of functioning. *DSM-IV* 27 (4th ed. Text rev. 2000).

by Dr. Forward, including the Bender-Gestalt test, the Wide Range Achievement Test III ("WRAT-III"), the Personality Assessment Inventory ("PAI"), the Beck Depression Inventory II ("BDI-II"), the Rotter Incomplete Sentence Blank Adult ("RISB"), and the Kinetic Family Drawing test ("KFD"). (AR 368-70.)

The test results were as follows.  The Bender-Gestalt test was within normal limits, but had indicators of depression according to Dr. Forward. (AR 368.)  The WRAT-III revealed Plaintiff as having a third-grade reading level, a first-grade spelling level, and a fifth-grade mathematics level. (AR 368.)  The PAI indicated that Plaintiff had a functional impairment due to sensory and motor dysfunction. (AR 368.)  This test also showed elevated indicators of depression and aggression. (AR 369.)  The BDI-II indicated that Plaintiff was suffering from mid-level depression. (AR 369.) The RISB indicated Plaintiff was experiencing feelings of depression, anger, self-doubt, and worthlessness. (AR 370.)  The KFD test revealed that Plaintiff had a distant relationship with his family. (AR 370.) The Axis I diagnosis revealed that Plaintiff was suffering from major depression, personality change due to a brain injury, cognitive disorder, and relational problems due to his brain injury.  (AR 370.)  The Axis II diagnosis indicated that Plaintiff had borderline intellectual functioning, and the Axis III diagnosis revealed that Plaintiff had a post traumatic brain injury and a seizure disorder. (AR 370.)  Dr. Forward concluded by opining that Plaintiff should not work because of his aggressive and depressive condition and recommended that Plaintiff attend therapy. (AR 370-71.)

On July 18, 2002, Peggy Jackson-Salcedo, Ph.D., conducted a psychological evaluation of Plaintiff. (AR 495.)  Plaintiff's attorney provided medical documents and cumulative school records to Dr. Jackson-Salcedo.  (AR 495-96.)  Dr. Jackson-Salcedo performed some tests on Plaintiff, including the Minnesota Multiphasic Personality Inventory 2 ("MMPI-2"), the WRAT-III, and the Trail Making Test ("TMT").  (AR 502-05.)  Plaintiff's results on the MMPI-2 were only of questionable utility due to the fact that Plaintiff did not pay enough attention to the test.  (AR 503.) Plaintiff's WRAT-III results indicated that Plaintiff had a third-grade reading level, a second-grade spelling level, and a third-grade mathematics level. (AR 505.)  The TMT showed that Plaintiff's

1  intelligence was "seriously impaired." (AR 506.) Dr. Jackson-Salcedo also reviewed Plaintiff's

2  cumulative school records and found that Plaintiff had a history of poor academic performance, he

3  repeated the first grade, and dropped out before completing 11th grade. (AR 501.) She concluded

4  that Plaintiff "could understand, remember, and carry out simple, repetitive instructions and duties,"

5  and recommended therapy. (AR 510-11.)

6      Plaintiff began attending group therapy with the Center for Recovery, Empowerment, and

7  Wellness ("CREW") in early 2004. (AR 644, 831.) These therapy sessions were intended to help

8  Plaintiff ameliorate his aggression, depression, and negativity. (AR 644.) Plaintiff attended many

9  meetings between January 2004 and March 2006. (AR 522-34, 551-642, 654-62, 666-726, 728-34,

10  742-49, 752-64, 766-86, 789-92.) Plaintiff also failed to attend many of the CREW meetings during

11  the same time period, skipping at least twenty-six sessions. (AR 553, 560-62, 567, 575, 582-84,

12  591-92, 598, 602-04, 612, 616, 623, 626, 629, 630-32, 634, 640, 642, 724.) During his CREW

13  sessions, Plaintiff attended multiple structured outings with the group. (AR 613, 615, 624.)

14  Notations in Plaintiff's CREW records indicate that during meetings Plaintiff was often in a good

15  mood, smiling and laughing with his peers and the staff. (AR 566, 655, 715, 770, 779.) On multiple

16  occasions, Plaintiff talked about activities that he enjoyed, including attending the CREW Christmas

17  party, visiting aquariums, museums, mountains, rivers, barbecues, and weddings, going camping,

18  watching movies, playing with his daughters, and cooking. (AR 557, 571, 593, 655, 657, 669, 692,

19  700, 706, 708.) Further, during these sessions Plaintiff indicated his interest in returning to school

20  and pursuing work. (AR 597, 669.) Plaintiff also discussed his seizures at CREW, noting that he

21  had learned how to anticipate his seizures and that he did not have problems with seizures or mood

22  swings if he took his medication. (AR 564, 599.) On one occasion, Plaintiff told his peers at CREW

23  that he had a history of severe physical abuse from his mother. (AR 702.) On another occasion,

24  Plaintiff shared with the group that he once purposely overdosed on his epilepsy medication, but said

25  that he placed his mother in charge of his medication to prevent this from happening again. (AR

26  680.)

27

28

Richard Engeln, Ph.D., conducted a psychological evaluation of Plaintiff on March 19, 2004. (AR 522.) While being interviewed by Dr. Engeln, Plaintiff said that he has "never had any drug or alcohol issues," and was not on probation or parole. (AR 523.) Plaintiff described his seizures to Dr. Engeln, and noted that at the time he was taking Dilantin, Tegretol, and Motrin to control his seizures. (AR 523.) Dr. Engeln conducted a number of tests on Plaintiff. (AR 525.) On the WAIS-III, Plaintiff scored a Verbal IQ of 72, a Performance IQ of 72, and a Full Scale IQ of 69. (AR 525.) Plaintiff's Bender-Gestalt results were characterized as high borderline. (AR 525.) Dr. Engeln found that Plaintiff's WRAT-III results showed that Plaintiff had a fourth-grade reading level, a second-grade spelling level, and a third-grade mathematics level. (AR 525-26.) Plaintiff's WMS-III scores indicated a moderate range of mental retardation, but Dr. Engeln noted that this probably reflected Plaintiff's "[c]oncentration issues." (AR 526.) Dr. Engeln diagnosed Plaintiff with depressive disorder, moderate to severe academic delay, and a seizure disorder controlled partially by medication. (AR 527.) Dr. Engeln concluded by opining that competitive job placement should be part of Plaintiff's mental health treatment process, stating that Plaintiff would be able to perform "one-to-two step simple job instructions." (AR 528.)

William Spindell, Ph.D., conducted a psychological evaluation of Plaintiff on July 7, 2006. (AR 728.) Dr. Spindell interviewed Plaintiff and noted that Plaintiff denied any prison, jail, or drug history. (AR 728.) Plaintiff underwent multiple tests administered by Dr. Spindell. (AR 729.) On the Bender-Gestalt test, Plaintiff's global score was 32. (AR 729.) Plaintiff completed both portions of the TMT without error. (AR 729.) Dr. Spindell noted that when performing the WMS, Plaintiff lacked motivation and "gave up rather easily on all tasks presented to him." (AR 729.) The WAIS-III showed Plaintiff had a Verbal IQ of 71, a Performance IQ of 68, and a Full Scale IQ of 67. (AR 729.) Dr. Spindell noted that Plaintiff's effort was minimal on the WAIS-III; thus his IQ scores were probably lower than they would have been otherwise. (AR 729.) In conclusion, Dr. Spindell opined that Plaintiff was capable of several entry-level jobs, as long as explanations were very clear. (AR 730.) In reviewing Plaintiff's other medical records, Dr. Spindell noted that the records presented

no reason to change his diagnosis and stated that they supported the finding that Plaintiff had adequate functional abilities for simple, repetitive tasks in the labor market. (AR 828.)

**B.     Administrative Proceedings**

      **1.     First Administrative Hearing and Decision**

            **a.     December 2002 ALJ Decision**

Plaintiff's initial application for benefits was denied on December 23, 1999, and again on reconsideration on May 11, 2000. (AR 85-88, 91-94.) On July 13, 2000, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and in May 2002 a hearing was held before ALJ James Ross. (AR 95, 844-68.) ALJ Ross issued a decision denying benefits on December 16, 2002. In his decision, the ALJ determined that the opinion of Dr. Peggy Jackson-Salcedo was entitled to little weight. (AR 64.) The ALJ explained that, although Dr. Jackson-Salcedo was to be provided copies of the reports of the prior psychological evaluations, the "claimant's representative then corrupted the process by communicating ex parte with the consultative examiner" by providing Dr. Jackson-Salcedo copies of various pieces of evidence, including prior psychological evaluations. (AR 64.)

In considering whether Plaintiff met any Listing, the ALJ determined that "[t]he record as a whole supports the conclusion that the claimant's mental impairments do not meet or equal any mental impairment listed in section 12.00 of the Listing of Impairments. Clearly there is no evidence of marked limitations in the functional areas mentioned above or of repeated episodes of decompensation." (AR 63.) The ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform simple, repetitive tasks not involving interaction with the public and that Plaintiff should observe seizure precautions.[3] (AR 64.) The ALJ then concluded that Plaintiff's nonexertional limitations did not significantly compromise his ability to perform unskilled work at

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

all exertional levels; the ALJ relied on the Medical-Vocational Guidelines (the "Grids") to determine that there were jobs in the national economy that Plaintiff could perform.  (AR 64.)

### b.    Review by the Appeals Council Granted

Plaintiff requested review of this decision by the Appeals Council ("AC").  The AC determined that the ALJ's December 2002 decision was erroneous on a number of grounds.  First, the AC stated that the decision did not adequately address Dr. Reinfurt's opinion that Plaintiff had a need to be in a structured work setting and had possible limitations for relating to co-workers and supervisors.  (AR 67.)  The AC also noted that Plaintiff had IQ scores in the 69 to 70 range and that the record reflected that Plaintiff has multiple nonexertional limitations, but no vocational evidence concerning the effect of these limitations on Plaintiff's occupational base was developed.  (AR 67.) The AC also determined that it was unclear whether Plaintiff's intellectual function was reduced because of brain injuries or represents a life-long condition.  The AC found that the rationale for rejecting the opinions of Dr. Forward and Dr. Jackson-Salcedo was inadequate, and those opinions were to be reconsidered by the ALJ.  (AR 67.)

### 2.    Second Administrative Hearing and Decision

### a.    November 2004 ALJ Decision

On remand, ALJ Ross conducted a second hearing in October 2004 and subsequently issued a decision denying Plaintiff's claim on November 15, 2004.  (AR 70-29, 869-94.)  Plaintiff submitted a brief to the ALJ asserting, among other things, that he meets Listing 12.05(C) because he has borderline IQ as evidenced by objective testing, and he has other impairments that the ALJ has found to be severe.  (AR 220-23.)

In considering the AC's remand order and Plaintiff's brief, the ALJ again refused to give weight to Dr. Jackson-Salcedo's opinion and repeated the same findings from his first decision.  (AR 77.)  The ALJ also found that Plaintiff had "severe" conditions at the Second Step as defined by Social Security Ruling ("SSR") 85-28 for a history of petit mal seizures, an organic mental disorder

with emotional lability and depression, and borderline intelligence.[4]  However, the ALJ concluded

without analysis that these impairments do not meet a Listing; the ALJ failed to consider whether

Plaintiff met the requirements of Listing 12.05(C).  (AR 74, 223.)  The ALJ found that Plaintiff's

mental impairments imposed only slight limitations on his ability to engage in daily living activities,

a slight to moderate difficulty in maintaining social functioning, and slight to moderate difficulty in

concentration, persistence, or pace.  (AR 77.)  The ALJ concluded that Plaintiff had the RFC for

simple, repetitive tasks not involving interactions with the public and that Plaintiff could perform

work at all exertional levels but with seizure precautions.  (AR 78.)  Considering testimony from a

VE, the ALJ determined that there were jobs in significant numbers in the economy that Plaintiff can

perform.  (AR 78.)

### b.    Review by the Appeals Council Granted

Plaintiff again requested that the AC review the November 15, 2004, decision asserting that

the ALJ had failed to adequately comply with the prior remand order.  (AR 124-25, 133-37.)

Specifically, Plaintiff asserted that the ALJ had failed to adequately consider whether Plaintiff meets

Listing 12.05 for mental retardation.  (AR 134 ("Considering that Full Scale IQ scores of 69-70 have

been confirmed by four psychologists, and that both his severe depression and his seizures are well-

documented, Johnathan Taylor should be granted SSI benefits immediately, pursuant to Listing

12.05C.").)

The AC again granted Plaintiff's request for review and remanded the matter to another ALJ

for consideration.  (AR 81-84.)  Specifically, the AC noted that adequate consideration of the

Listings had not been provided.  (AR 81.)  The AC determined that the ALJ's decision "does not

reveal consideration of the guidance provided under sections 11.00F, 12.00c10, and 12.00c8 of

20 [C.F.R.] Part 404, Subpart P, Appendix 1[,] and it does not provide analysis addressing the

---

[4] SSRs are "final opinions and orders and statements of policy and interpretations" that the Social Security
Administration has adopted.  20 C.F.R. § 402.35(b)(1).  Once published, these rulings are binding precedent upon ALJs.
*Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 692 n.2 (9th
Cir. 1999).

requirements of applicable provisions of the Listing of Impairments at sections 11.18, 12.02, and 12.05." (AR 81.)

The AC also noted that the ALJ's decision contained the same rationale with regard to the medical opinions of Drs. Forward and Jackson-Salcedo as the first ALJ's decision that did not address the AC's concerns. (AR 81.)  The AC's remand order required the ALJ to obtain a medical expert who would specifically address Listing 12.05, among other sections of the Listings. (AR 82.) The ALJ was ordered to consider all the medical opinions and describe the weight assigned to each. (AR 83.)  The ALJ was also ordered to consider whether expert testimony from a VE was warranted and to pose a hypothetical to the VE reflecting the specific capacity and limitations established by the record as a whole.  (AR 83.)

### 3.      Third Administrative Hearing and Decision After Appeals Council Remand

#### a.      Plaintiff's Brief to the ALJ

On August 17, 2006, Plaintiff submitted a brief to the ALJ.  Among other arguments, Plaintiff specifically asserted that he meets the Listing for mental retardation pursuant to section 12.05(C). (AR 244.)  Plaintiff asserted that his IQ scores were confirmed by five psychologists and the impairments of severe depression and continued seizures are "well-documented," and meet the second prong of Listing 12.05(C). (AR 244.)

#### b.      August 2006 Hearing

On August 17, 2006, ALJ Bert Hoffman conducted a hearing.  (AR 895-958.)  Plaintiff testified that he still had memory and anger problems, but stated that it had been a few years since his last big seizure. (AR 904, 909, 910.)  Plaintiff also testified that he had never gotten into trouble with the police.  (AR 910.)   When asked about his medications, Plaintiff testified that he took Dilantin and Tegretol for his seizures, Motrin for head pain, and Lexapro.  (AR 916-17.)  Plaintiff stated that these medications caused him to stumble and feel drowsy.  (AR 921-22.)  Plaintiff also admitted that he did not always take his medications according to the doctor's directions.  (AR 926.)

Plaintiff's mother, Ms. Linda Howell, also testified at the hearing.  Ms. Howell stated that Plaintiff had not been in any trouble with the police since the accident in 1999, but later admitted that Plaintiff was involved in a burglary after the date. (AR 940-41.)  Ms. Howell stated that because

Plaintiff would forget to take his medication, she took on the responsibility of administering it to Plaintiff.  (AR 951.)

### c.    ALJ's February 2007 Decision

ALJ Hoffman rendered an unfavorable decision on February 15, 2007.  (AR 11-13, 21-36.) In his decision, the ALJ found Plaintiff not disabled since October 1, 1999.  (AR 24.) The ALJ found that Plaintiff had three severe impairments at the Second Step of the sequential evaluation process: (1) history of petit mal seizures; (2) organic mental disorder with emotional lability and depression; (3) borderline IQ.  (AR 26.)  At the Third Step, the ALJ found that Plaintiff did not meet the Listings at section 11.03, 12.02, 12.04 or any other section.  (AR 26-27.)  The ALJ determined that Plaintiff had mild restriction of daily living activities, mild difficulties in maintaining social functioning, moderate difficulties in maintain concentration, persistence, or pace, and had no episodes of decompensation.  (AR 27.)  No specific consideration was given to Listing 12.05(C).  The ALJ also gave no weight to the opinion of Dr. Jackson-Salcedo citing corruption of the process.  (AR 35.)

The Appeals Council denied Plaintiff's request for review on May 7, 2009, and the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

## C.    Plaintiff's Appeal

On July 13, 2009, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.   First, Plaintiff argues that the ALJ erred in determining that other work existed for Plaintiff.  Second, Plaintiff asserts that the ALJ improperly discounted the opinion of Dr. Jackson-Salcedo.  Third, Plaintiff contends that the ALJ failed to evaluate evidence of Plaintiff's presumptive disability under listing 12.05.   Fourth, Plaintiff maintains that the ALJ's findings of Plaintiff's residual functioning capacity were not supported by substantial evidence.  Finally, Plaintiff asserts that the ALJ failed to provide legally sufficient reasons for rejecting Plaintiff's testimony.

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must

determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the

claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work. *Id.* §§ 404.1520(f), 416.920(f). If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## DISCUSSION

**A.      Rejection of Medical Evidence**

   **1.      Dr. Jackson-Salcedo's Opinion was Improperly Rejected**

Plaintiff asserts that the ALJ improperly rejected the opinion of Dr. Jackson-Salcedo on the ground that her opinion was corrupted by the ex parte communication between Dr. Jackson-Salcedo and Plaintiff's counsel, Barbara Sena. Plaintiff contends that the ALJ's rejection of this opinion evidence was not supported by any legitimate reason or any explanation as to how contact between the doctor and Plaintiff's counsel actually corrupted the process. The Commissioner argues that ALJ Hoffman sought clarification regarding the circumstances of the corrupted opinion, complied with the Appeals Council's remand orders, and properly gave little weight to Dr. Jackson-Salcedo's opinion. Further, the Commissioner asserts that, even if the opinion was improperly discounted, it was harmless error because Dr. Jackson-Salcedo's opinion was consistent with the ALJ's RFC determination.

On July 18, 2001, Dr. Jackson-Salcedo conducted a psychological evaluation of Plaintiff. (AR 495-511.) Dr. Jackson-Salcedo provided a lengthy and detailed summary of the evaluation; she noted all the materials she reviewed for purposes of her assessment, including several medical records and school records of Plaintiff that were provided by Plaintiff's counsel, Ms. Barbara Sena. (AR 496.)

On December 16, 2002, the ALJ considered Dr. Jackson-Salcedo's opinion and determined the following:

> Peggy Jackson-Salcedo, Ph.D., evaluated the claimant and concluded he could understand, remember, and carry out simple, repetitive instructions. Although he basically presented in a dull and flat manner often hanging his head, overall he made a "somewhat good" effort to interact appropriately on a social level (Ex. 16F, p. 16). Dr. Jackson-Salcedo further stated her opinion that the claimant was severely limited but not precluded from carrying out detained instructions, interacting appropriately with supervisors, and responding appropriately to work pressures in a usual work setting (Ex. 16F, pp. 24-25.)
>
> Unfortunately, little weight can be given to the report of this consultative examination. The Administrative Law Judge arranged for the consultative examiner to be provided copies of the reports of the prior psychological evaluations (Exs. 6F, 11F, 15F). The claimant's representative then corrupted the process by communicating ex parte with the consultative examiner (Ex. 16F, p. 2). Consequently, the conclusions of Dr. Jackson-Salcedo are of little evidentiary value.

(AR 63-64.) Ultimately, the ALJ concluded that Plaintiff was not disabled. Plaintiff sought review of this ALJ decision before the AC. In a July 23, 2003, memorandum to the AC, Plaintiff argued that the ALJ improperly rejected the opinion of Dr. Jackson-Salcedo. Plaintiff's counsel explained the circumstances of her contact with Dr. Jackson-Salcedo as follows:

> The ALJ rejected Dr. Jackson-Salcedo's report despite the fact that he himself had ordered her to do a post-hearing evaluation. His reason for rejection was that the report of Dr. Jackson-Salcedo was "corrupted" by Claimant's representative by "communicating ex parte" with Dr. Jackson-Salcedo. (ALJ Decision, p. 5) This "communication" consisted of assisting Dr. Jackson-Salcedo in obtaining, at Dr. Jackson-Salcedo's request, Claimant's cumulative school record, as well as making sure that Dr. Jackson-Salcedo had been provided <u>all</u> the records already in evidence, including those not provided to her by the ALJ, so that she would have the entire picture of Mr. Taylor's medical treatment. This conduct did not constitute "corruption," but merely the representation of a complete record to Dr. Jackson-Salcedo for her review.

(AR 218.)

On October 8, 2003, the AC ordered that the matter be remanded for another hearing and a new decision. (AR 67-69.) Although the remand was premised on several grounds, the AC specifically noted that it was "unclear whether there was any communication between [Plaintiff's counsel] and [Dr. Jackson-Salcedo] other than referral of copies of evidence in the record." (AR 67.) The AC determined that further consideration of Dr. Jackson-Salcedo's opinion was warranted. (AR 67.)

Following the AC's remand, another hearing was conducted on October 7, 2004.  (AR 869-94.)  The hearing transcript does not indicate that this issue was discussed or clarified.  Neither party cites any documentation indicating that the ALJ sought further clarification of the contact between Dr. Jackson-Salcedo and Ms. Sena, and the Court finds no evidence in the 959-page record that indicates further clarification by the ALJ of this issue.  On November 15, 2004, the ALJ issued another decision, denying Plaintiff's application for disability.  (AR 73-79.)  With regard to Dr. Jackson-Salcedo, the ALJ explained the weight given to that opinion:

> As noted in the prior decision, the opinion of the psychologist, Peggy Jackson-Salcedo, (Exhibit 16F, p. 16) continues to be given little weight.  The undersigned provided copies of the reports of the prior psychological evaluations to the examiner (Exhibits 6F, 11F, and 15F), but claimant's representative then corrupted the process by communicating ex parte with the consultative examiner by providin[g] selective other documents (Exhibit 16F, p. 2).  Consequently, the conclusions of Dr. Jackson-Salcedo are given little evidentiary value.

(AR 77.)  Plaintiff again filed a request with the AC seeking review of the unfavorable November 2004 decision.  On May 14, 2005, Plaintiff submitted another brief in support of the request for AC review.  (AR 133-37).[5]

On November 29, 2005, the AC again granted review and remanded the matter to a different ALJ for further proceedings.  With regard to the ALJ's consideration of Dr. Jackson-Salcedo's opinion the AC again noted as follows:

> [W]hile the decision gives little weight to the opinions in 16F [Dr. Jackson-Salcedo] because of reported corruption of the process due to ex parte communications by the representative with the consultant, the decision does not discuss specific indicators of corruption in the evaluation itself and it does not reflect that the consultant was contacted to clarify the circumstances of the reported corruption.  The representative stated that the consultant requested additional evidence and that the contact was limited to providing copies of the claimant's cumulative school record as well as evidence in the record not previously provided when ordering the consultative examination (Exhibit 14E/6).

(AR 82.)

On August 17, 2006, another hearing was held before a different ALJ.  (AR 895-959).  Ms. Sena again appeared at the hearing as counsel for Plaintiff.  Nothing in the transcript of this hearing

---

[5] Plaintiff's brief to the Appeals Council, located at pages 133 to 137 in the record is incomplete.  The November 2005 Appeals Council decision to remand references page 6 of the Plaintiff's brief to the Appeals Council, but page 6 is not included in the record.  Based on the Appeals Council's decision, it appears that Plaintiff had again addressed the "corruption" finding with regard to Dr. Jackson-Salcedo's opinion on page 6 of that brief.

1    indicates this issued was clarified, nor has the Court located any documents in the record indicating

2    that this issue was given further consideration by the ALJ or that clarification was sought either from

3    Dr. Jackson-Salcedo or from Ms. Sena.

4          On February 15, 2007, the ALJ issued a new decision finding Plaintiff not disabled. (AR 24-

5    36.) As it relates to the opinion of Dr. Jackson-Salcedo, the ALJ again gave this opinion little weight

6    asserting the following:

7          The prior decision also gave little weight to the opinion in Exhibit 16F because of
           reported corruption of the process due to ex parte communications by the
8          representative with the consultant. The representative stated the consultant requested
           additional evidence and that the contact was limited to providing copies of the
9          claimant's cumulative school record as well as evidence in the record not previously
           provided when ordering the consultative examination (Exhibit 14E, p. 6). The
10         conclusions of Dr. Jackson-Salcedo continue to be given little weight.

11   (AR 35.) Despite Plaintiff's request for AC review, the AC determined there was "no reason under

12   [its] rules to review the [ALJ's] decision." (AR 11.)

13         A finding that Plaintiff's counsel corrupted the administrative process by providing Plaintiff's

14   medical and school records to an agency examining physician without any rationale supporting this

15   finding is error.   The Commissioner argues that the ALJ "sought clarification regarding the

16   circumstances of the corrupted opinion." (Doc. 16, 8:5-6.) The Commissioner cites no evidence in

17   the record to support this contention other than the ALJ's decision and the AC remand order. These

18   documents contain no evidence that the ALJ contacted Dr. Jackson-Salcedo or Ms. Sena regarding

19   this communication, nor does the ALJ explain why this contact corrupted the process. Rather, the

20   ALJ reiterates the exact same finding that the AC twice found inadequate.

21         Defendant notes that the AC determined that there was no error in this final February 2007

22   ALJ decision and that the AC is in the best position to review whether the ALJ complied with the

23   remand order with regard to Dr. Jackson-Salcedo's opinion.  Whatever the AC's reason for its final

24   refusal to review the ALJ's decision, without any stated rationale by the ALJ as to why the

25   communication between Plaintiff's attorney and Dr. Jackson-Salcedo amounted to corruption of the

26   process, the finding is not conducive to judicial review.  There are no legitimate reasons offered for

27   rejecting this opinion, and this is not legally sufficient. *Lester*, 81 F.3d at 830-31 ("[T]he opinion

28

1  of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and

2  legitimate reasons that are supported by substantial evidence in the record.").

3       **2.      Dr. Jackson-Salcedo's Opinion is Credited As True**

4       Generally, "[w]here the Commissioner fails to provide adequate reasons for rejecting the

5  opinion of a treating or examining physician, [the Court credits] that opinion as 'a matter of law.'"

6  *Lester*, 81 F.3d at 830-34 (finding that, if doctors' opinions and plaintiff's testimony were credited

7  as true, plaintiff's condition met a listing (quoting *Hammond v. Bowen*, 879 F.2d 498, 502 (9th Cir.

8  1989))).  Crediting an opinion as a matter of law is appropriate when, taking that opinion as true, the

9  evidence supports a finding of disability.  *See Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).

10      Dr. Jackson-Salcedo diagnosed Plaintiff with major depressive disorder, moderate;

11  personality change due to brain injury; cognitive disorder; relation problems due to a medical

12  condition; borderline intellectual functioning; seizure disorder; psychosocial and environmental

13  problems; and assigned a Global Assessment of Functioning ("GAF") score of 40.  She evaluated

14  Plaintiff using a Wide Range Achievement Test, Revision 3 ("WRAT-3").  She interpreted the

15  results of the test as indicating a standard score for reading of 67, which she found "commensurate"

16  with his WAIS-III full scale IQ of 70 as determined by Dr. Reinfurt.  Dr. Jackson-Salcedo also

17  reviewed Plaintiff's cumulative school records and noted his long-standing academic difficulties.

18  (AR 501.)

19      When credited as true, Dr. Jackson-Salcedo's opinion provides substantial evidence related

20  to the requirements of Listing 12.05(C).  Her discussion of Plaintiff's academic history provides

21  substantial evidence that Plaintiff's borderline cognitive functioning pre-dated his head injuries.

22  Further, her opinion and findings also provide substantial evidence of deficits in Plaintiff's adaptive

23  functioning, which is a component of Listing 12.05(C).  As discussed below, when Dr. Jackson-

24  Salcedo's opinion and examination results are credited as true, it is evident that Plaintiff is

25  presumptively disabled at the Third Step of the sequential evaluation pursuant to Listing 12.05(C)

26  for "mental retardation."  Similarly, it is clear that the ALJ would be required to find Plaintiff met

27  Listing 12.05(C) on remand if such evidence were credited.  Worded differently, particularly in light

28

of Dr. Jackson-Salcedo's evaluation of Plaintiff, the Court concludes that there is no substantial evidence in the record to support a finding that Plaintiff does *not* meet Listing 12.05(C).[6]

## B. Plaintiff's Traumatic Brain Injury During the Development Period Does not Disqualify Him From Meeting Listing 12.05(C)

Plaintiff asserts that he meets the requirements of Listing 12.05(C) and the ALJ erred by failing to find Plaintiff disabled at the Third Step of the sequential evaluation. As an initial matter, the Court considers whether Plaintiff's brain injuries during the developmental period preclude him from meeting Listing 12.05(C). There are three prongs Plaintiff must establish to meet the requirements of Listing 12.05(C): (1) qualifying IQ scores of 60 through 70; (2) additional and significant work-related limitations of function; and (3) significant subaverage general intellectual functioning (as evidenced by IQ scores) with deficits in adaptive functioning initially manifested during the developmental period, i.e., before age 22. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00, 12.05, 12.05(C).

Plaintiff suffered two traumatic brain injuries ("TBI") when he was 19 and 20 years old. The record does not indicate that there are any IQ scores *prior* to these brain injuries. There are, however, IQ scores during the developmental period *subsequent* to Plaintiff's TBIs. As these brain injuries were sustained during the developmental period, the Court addresses first whether these injuries potentially preclude Plaintiff from meeting the requirements of Listing 12.05(C).

In cases where no IQ testing is performed during the developmental period, but an IQ score during adulthood fits the requirement of Listing 12.05(C), courts will typically apply a presumption that the claimant's impairment existed during the developmental period. *See Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001) (IQ tests after age 22 satisfy the listing criteria and "create a rebuttable presumption of a fairly constant IQ throughout life") (citing *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) and *Luckey v. U.S. Dep't of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989)); *see also Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001) (IQ score after developmental

---

[6] The Court notes that one non-examining consultative agency psychiatrist, Archimedes Garcia, M.D., completed a psychiatric review technique form on May 4, 2000, and checked a box indicating that there was no sign or symptom which appropriately fits Listing 12.05 diagnostic criteria. (AR 345.) This opinion was not discussed by the ALJ and, by itself, does not constitute substantial evidence. *Lester*, 81 F.3d at 831 (citing *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990)).

1  period must be coupled with other evidence of onset during the developmental period); *Markle v.*

2  *Barnhart*, 324 F.3d 182, 189 (3d Cir. 2003).  This presumption may be rebutted by evidence that an

3  injury *during adulthood* caused the intellectual impairment.  *See Maresh v. Barnhart*, 438 F.3d 897,

4  900 (8th Cir. 2006) ("a person's IQ is presumed to remain stable over time in the absence of any

5  evidence of a change in a claimant's intellectual functioning").

6  　　　However, there is minimal case authority that directly addresses whether Listing 12.05(C)

7  applies where an injury *during the developmental period* causes impairments in a claimant's

8  intellectual functioning.  As the Seventh Circuit has observed, "[t]he requirement of early onset and

9  the reference to the claimant's 'developmental period' seem intended to limit coverage to an innate

10  condition . . . rather than a condition resulting from a disease or accident in adulthood."  *Novy v.*

11  *Astrue*, 497 F.3d 708, 709 (7th Cir. 2007) (citing *Brown v. Sec'y of Health & Human Servs*., 948 F.2d

12  268, 271 (6th Cir. 1991)).  In other words, a TBI that *causes* "mental retardation" during the

13  developmental period would not necessarily indicate an innate condition.  However, in *Novy* the

14  Seventh Circuit observed that the Sixth Circuit in *Tennessee Protection & Advocacy, Inc. v. Wells*

15  ("*Wells*"), 371 F.3d 342, 346-50 (6th Cir. 2004) "forcefully questioned" the proposition that a

16  developmental disorder by definition excludes mental retardation caused by a TBI during the

17  developmental period.

18  　　　In *Wells*, the United States Court of Appeals for the Sixth Circuit considered the definition

19  of "developmental disability" under the Developmental Disabilities Assistance and Bill of Rights

20  Act of 2000 and whether it could apply to an individual who sustained a brain injury at the age of

21  20 resulting in cognitive impairment.  Pursuant to 42 U.S.C. § 15002(8)(A), a developmental

22  disability must, among other requirements, manifest itself before the individual attains the age of 22.

23  The district court had concluded that the clear language of the statute reflected that it was intended

24  to cover individuals who have some physical or mental disability or condition as a result of *natural*

25  *causes*.  *Wells*, 371 F.3d at 346.  The district court reasoned that to expand the definition further to

26  include disabilities resulting from injury would ignore the meaning of the word "developmental,"

27  and the individual could not be considered to suffer a developmental disability under the statute.  *Id.*

28  The Sixth Circuit reversed the district court, determining that, although the individual at issue

1 sustained a brain injury at age 20 which caused his mental disability, he nonetheless fell "into the

2 category of people whom Congress intended to protect." *Id.* at 349.  The court held that the district

3 court "erred in inferring a requirement that the disability resulted from natural causes because

4 reference to injury is lacking in the statute." *Id.*

5 Considering this case authority as well as the record, the Court finds that Plaintiff is not

6 precluded from meeting the requirements of Listing 12.05(C) for two distinct reasons.  First,

7 substantial evidence indicates that Plaintiff's cognitive impairment arose prior to his injuries and was

8 not necessarily caused by his TBIs.  Plaintiff exhibited deficits in adaptive functioning, a key

9 component of the diagnostic criteria for mental retardation under the *Diagnostic & Statistical*

10 *Manual of Mental Disorders with Technical Revisions,* ("DSM-IV-TR"), *prior* to his head injuries.

11 According to the DSM-IV-TR, "[i]mpairments in adaptive functioning, rather than a low IQ, are

12 usually the presenting symptoms in individuals with Mental Retardation.  DSM-IV-TR at 41.

13 Adaptive functioning refers to how effectively individuals cope with common life demands and how

14 well they meet the standards of personal independence expected of someone in their particular age

15 group, sociocultural background, and community setting."  Deficits in adaptive functioning are

16 shown by "significant limitations in at least two of the following skill areas: communication, self-

17 care, home living, social/interpersonal skills, use of community resources, self-direction, functional

18 academic skills, work, leisure, health, and safety."  *Id.* at 49.  Each mental health professional who

19 examined Plaintiff discussed his poor academic performance prior to his injuries (AR 337, 367, 501,

20 522, 728), that Plaintiff did not finish high school (AR 337, 366, 501, 522, 728), that he had never

21 had significant employment as an adult either before or after his brain injury (AR 337, 370, 502, 523,

22 728), and that he has not lived independently but instead has lived with his mother (AR 510), his

23 sister (AR 29), or a family friend (AR 365).

24 Further, there is no competent medical evidence that Plaintiff's brain injuries caused the

25 impairments in his cognitive functioning.  William Spindell, Ph.D., diagnosed Plaintiff with mild

26 mental retardation "probably associated with [his] ongoing seizure disorder under minimal control."

27 (AR 729.)  The medical records suggest that Plaintiff's seizure disorder is associated with his TBI

28 (*see* AR 805), but it is questionable whether Dr. Spindell is competent to render an opinion as to

1    neurological causation and, even assuming he is, his opinion as to causation is both equivocal and

2    unexplained.  Thus, this portion of his opinion does not constitute substantial evidence.  *See Young*

3    *v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990) (substantial evidence is relevant evidence which a

4    reasonable person might accept as adequate to support a conclusion).  The Court also notes that, after

5    reviewing the testing administered by Dr. Reinfurt, Dr. Forward specifically noted that "Mr. Taylor

6    has not undergone a neuropsychological evaluation to determine the severity of impairment due to

7    his brain injury. . . ." (AR 371.)[7]  Dr. Spindell administered the Bender Visual Motor Gestalt II, the

8    Wechsler Memory Scale, and the WAIS-III, which were the same tests conducted by Dr. Reinfurt

9    that Dr. Forward noted did not constitute specialized neuropsychological evaluations.[8]  None of the

10   other four examining psychologists, who all administered intelligence tests that yielded scores

11   implicating impaired cognitive functioning, opined or hypothesized that Plaintiff's borderline

12   intellectual functioning resulted from his brain injuries.

13       Second, even if it could be medically ascertained that Plaintiff's TBIs caused his cognitive

14   impairments, Plaintiff is still not precluded from meeting the requirements of Listing 12.05(C)

15   because his disability manifested during the developmental period, i.e., prior to age 22.  As explained

16   by the court in *Wells*, the regulatory Listing 12.05(C) set forth in 20 C.F.R. Pt. 404, Subpt. P, App.

17   1, like the language in 42 U.S.C. § 15002(8)(A), contains no requirement that the disability suffered

18

19       [7] Dr. Forward's opinion was rejected by the ALJ because it was (1) inconsistent with the evidence of record;

20   (2) purchased by Plaintiff's representative; and (3) based solely on information provided by the claimant. (AR 35.) The
     Court does not rely on Dr. Forward's substantive opinions as substantial evidence.  However, the Court notes that none

21   of these reasons for rejecting Dr. Forward is specific and legitimate.  First, there is no explanation how Dr. Forward's
     opinion is inconsistent with the evidence of record, thus this rationale does not meet the requisite level of specificity

22   necessary to reject the opinion.  Moreover, Dr. Forward's psychological testing results appear generally consistent with
     Dr. Reinfurt, Dr. Jackson-Salcedo, Dr. Engeln, and Dr. Spindell.  Second, the fact that Dr. Forward was solicited by

23   Plaintiff's counsel to perform the evaluation is not a legitimate reason to reject the opinion.  *Ratto v. Sec'y, Dep't of*
     *Health & Human Servs.*, 839 F. Supp. 1415, 1426 (D. Or. 1993) ("The Secretary may not assume that doctors routinely

24   lie in order to help their patients collect disability benefits." (citing *Rodriquez v. Brown*, 876 F.2d 759, 761-62 n.6 (9th
     Cir. 1989))).  Finally, the opinion was not based solely on information provided by the claimant, but contained Dr.

25   Forward's observations of the claimant as well as interpretation of psychological test results.  *Ryan v. Comm'r of Soc.*
     *Sec.*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008) ("But an ALJ does not provide clear and convincing reasons for rejecting

26   an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not
     discredit those complaints and supports his ultimate opinion with his own observations.").  Rejection of Dr. Forward's

27   opinion on this basis would require the rejection of every single doctor who evaluated Plaintiff.

28       [8] The table of contents to the administrative record labels Dr. Spindell's evaluation as a "consultative
     neuropsychological examination."

21

must result from natural causes; nor can the regulation be interpreted to contain such a requirement because there is no reference to injury or the absence of injury in the regulatory description of mental retardation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00, 12.05(C).

In *Stokes v. Astrue*, No. CV 09-1264-PK, 2011 WL 285224 (D. Or. Jan. 4, 2011), *adopted in full by Stokes v. Astrue*, No. CV 09-1264-PK, 2011 WL 284433 (D. Or. Jan. 24, 2011), the court determined that a claimant who had suffered multiple childhood head traumas and other injuries and who demonstrated impaired cognitive functioning during the developmental period met the requirements of Listing 12.05(C), and ordered that the claimant be awarded benefits. Thus, drawing upon the rationale of *Wells* and applying it in the context of Listing 12.05(C) in the same manner as *Stokes v. Astrue*, Plaintiff may still be found to meet the requirements of 12.05(C) even if his "mental retardation" arose as a result of injuries sustained during the developmental period. As set forth below, substantial evidence establishes that Plaintiff meets Listing 12.05(C).

## C.   Plaintiff Meets Listing 12.05(C)

A claimant is presumptively disabled and entitled to benefits if he or she meets or equals a listed impairment. To "meet" a listed impairment, a disability claimant must establish that his condition satisfies every element of the listed impairment in question. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Tackett*, 180 F.3d at 1099. To "equal" a listed impairment, a claimant "must establish symptoms, signs, and laboratory findings" at least equal in severity and duration to each element of the most similar listed impairment. *Id*. at 1099-1100.

To meet most of the mental disorder listings, a claimant must demonstrate the existence of impairment-related functional limitations that are incompatible with the ability to perform substantial gainful activity and that are the result of the mental disorder described in the listing, which must be manifested by the medical findings specified for that disorder. However, Section 12.05 does not follow that pattern. Appendix I to Title 20 of the Code of Federal Regulations provides the following:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we

22

will find that your impairment meets the listing . . . . For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., it is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A.

The introductory paragraph of section 12.05 states that: "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Paragraphs A through D provide the following:

A.     Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; Or

B.     A valid verbal, performance, or full scale IQ of 59 or less; Or

C.     A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; Or

D.     A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or
2.  Marked difficulties in maintaining social functioning; or
3.  Marked difficulties in maintaining concentration, persistence, or pace; or
4.  Repeated episodes of decompensation, each of extended duration.

Plaintiff asserts that all four doctors who administered IQ testing reported at least one score of 70 or less, and the ALJ failed to consider whether Plaintiff met the requirements of Listing 12.05(C). Defendant asserts that the ALJ found Plaintiff had only mild restrictions of daily living and maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation. Further, Defendant contends that the ALJ found that Plaintiff's impairments do not pose a significant work-related limitation of function. Defendant,

23

1    therefore, concludes that Plaintiff does not meet any of the criteria provided in paragraphs A through

2    D of Listing 12.05.

3        There are three prongs Plaintiff must establish to meet the requirements of Listing 12.05(C):

4    (1) qualifying IQ scores of 60 through 70; (2) additional and significant work-related limitations of

5    function; and (3) significant subaverage general intellectual functioning (as evidenced by IQ scores)

6    with deficits in adaptive functioning initially manifested before age 22.  The Court considers each

7    of these prongs below.

8        **1.       Plaintiff has Qualifying IQ Scores**

9        The first prong of Section 12.05(C) requires a valid verbal, performance, or full scale IQ of

10   60 through 70.  *Fanning v. Bowen*, 827 F.2d 631, 633 (9th Cir. 1986).   Numerous test scores in the

11   record indicate that Plaintiff has a valid verbal, performance, or full scale IQ that meets the first

12   prong.  Dr. Reinfurt determined that Plaintiff's WAIS-III test results indicated a verbal IQ of 69, a

13   performance IQ of 76, and a full scale IQ of 70 (AR 338); Dr. Engeln determined that Plaintiff's

14   WAIS-III test results indicated a verbal IQ score of 69, a performance IQ score of 78, and a full scale

15   IQ of 70 (AR 524); Dr. Spindell determined that Plaintiff's estimated IQ on the WAIS-III was a

16   verbal IQ of 71, a performance IQ of 68, and a full scale IQ of 67 (AR 729).[9]  Dr. Jackson-Salcedo

17   determined that Plaintiff's WRAT-3 test score for reading "is commensurate with his WAIS-III full

18   scale IQ of 70 as measured by Dr. Reinfurt.  (AR 505.)   However, all of these IQ tests, with the

19   exception of the testing conducted by Dr. Reinfurt, were obtained after Plaintiff attained the age of

20   22.  Thus, the only IQ tests that provide evidence of subaverage general intellectual functioning prior

21   to the age of 22 are those reported by Dr. Reinfurt.

22       Although not all the scores reported by Dr. Reinfurt are 70 or below, Plaintiff's verbal IQ and

23   full scale IQ were within the correct range to meet Listing 12.05(C).  Courts in the Ninth Circuit

24   have held that where multiple or conflicting IQ scores are available, the operative score for purposes

25   of determining whether a claimant's impairments meet or equal Listing 12.05(C) is the lowest "valid

26

27       [9] Dr. Spindell specifically noted that, because Plaintiff's efforts were minimal on his WAIS-III test, the
     computed IQ values were "underestimates" of his ability.  (AR 729.)  The results derived from testing performed by Dr.

28   Spindell are, therefore, unreliable.

verbal, performance, or full scale IQ" score the claimant has received. *See Fanning*, 827 F.2d at 633 (holding that where a claimant underwent IQ tests in both 1982 and 1983, higher scores obtained in 1983 did not render lower scores obtained in 1982 invalid for purposes of listing 12.05(C)); *Ray v. Chater*, 934 F. Supp. 347, 350 (N.D. Cal. 1996) (finding that "it can be inferred that when multiple IQ scores are available the Regulations prefer the lowest score"); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c) ("In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."). These IQ scores, which were considered valid by Dr. Reinfurt (*see* AR 338), constitute substantial evidence that Plaintiff meets the first prong of Listing 12.05(C).

### 2. Plaintiff Suffered from Additional and Significant Work-Related Limitations of Function

The second prong of 12.05(C) requires a finding that Plaintiff suffers an additional impairment that imposes a significant work-related limitation of function. The ALJ determined that Plaintiff had the following <u>severe</u> impairments (1) history of petit mal seizures; (2) organic mental disorder with emotional lability and depression; and (3) borderline IQ. (AR 26.) A finding of a severe impairment at the Second Step is a *per se* finding of an "impairment imposing additional and significant work-related limitations of function" as defined in the second prong of Listing 12.05(C). *See Fanning*, 827 F.2d at 633; *Huber v. Astrue*, No. CV 10-8043-PCT-DGT, 2010 WL 4684021, at *2 (D. Ariz. Nov. 12, 2010); *Rowens v. Astrue*, No. 09-cv-00163 GGH, 2010 WL 3036478, at *3 (E.D. Cal. Aug. 2, 2010) ("[I]n this circuit, a person who has a severe physical or other mental impairment, as defined at step two of the disability analysis, apart from the decreased intellectual function, meets the second prong of the § 12.05(C) listing."); *Campbell v. Comm'r. of Soc. Sec.*, No. 09-cv-00465-GSA, 2011 WL 444783, at *18 (E.D. Cal. Feb. 8, 2011); *see also Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997); *Edwards v. Heckler*, 736 F.2d 625, 629-31 (11th Cir. 1984); *Nieves v. Sec'y of Health & Human Servs.*, 775 F.2d 12, 14 n.7 (1st Cir. 1985). The fact that a severe impairment imposes significant work-related limitations of function is particularly evident when considering the Social Security Administration's definition of a severe impairment at the Second

1    Step: "You must have a severe impairment.  If you do not have any impairment or combination of

2    impairments which significantly limits your physical or mental ability to do basic work activities,

3    we will find that you do not have a severe impairment and are, therefore, not disabled."  20 C.F.R.

4    § 416.920(c).  As the ALJ determined that Plaintiff had additional severe impairments apart from

5    his decreased intellectual functioning, the second prong of Listing 12.05(C) is established.

6        **3.    The Onset of Plaintiff's "Mental Retardation" Manifested Before Age 22**

7        To satisfy the introductory paragraph of Listing 12.05, there must be evidence of

8    "significantly subaverage general intellectual functioning with deficits in adaptive functioning

9    initially manifested during the developmental period; i.e., the evidence demonstrates or supports

10   onset of the impairment before age 22."  20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05.

11       Here, Plaintiff's IQ scores reported by Dr. Reinfurt indicate significant subaverage general

12   intellectual functioning during his developmental period.  While these test scores came after Plaintiff

13   suffered traumatic brain injury, as discussed above, they nevertheless reported Plaintiff's intellectual

14   functioning during the developmental period.

15       Beyond a qualifying IQ score, a claimant must also demonstrate deficiencies in adaptive

16   functioning during the developmental period.  As explained above, when determining whether a

17   claimant demonstrates deficits in adaptive functioning, courts consider a variety of factors, including

18   a claimant's poor academic performance, participation in special education, and work history.  *See,*

19   *e.g., Lewis v. Astrue,* No. CV-10-63-SU, 2011 WL 1085254 (D. Or. Feb. 15, 2011), *recommendation*

20   *adopted by Lewis v. Astrue*, NO. CV-10-63-SU, 2011 WL 1042676 (D. Or. Mar. 22, 2011);

21   *Cauffman v. Astrue*, No. C10-281-JCC-JPD, 2010 WL 5464815, at *9 (W.D. Wash. Nov. 12, 2010)

22   (citing *Hernandez v. Astrue*, 380 Fed. App'x 699, 701 (9th Cir. 2010))*; Ware ex rel. v. Shalala*,

23   902 F. Supp. 1262, 1271 (E.D. Wash. 1995); *Markle*, 324 F.3d at 189; *Christner v. Astrue*, 498 F.3d

24   790, 793 (9th Cir. 2007)).  Deficits in adaptive functioning are shown by "significant limitations in

25   at least two of the following skill areas: communication, self-care, home living, social/interpersonal

26   skills, use of community resources, self-direction, functional academic skills, work, leisure, health,

27   and safety."  DSM-IV-TR at 49.

28

Even before Plaintiff suffered any traumatic brain injuries, there is substantial evidence reflecting deficits in adaptive functioning. As Dr. Jackson-Salcedo observed in her psychological evaluation, Plaintiff did not complete the 11th grade, he repeated first grade, and his teachers noted a lack of academic achievement as well as an inability to pay attention in class, failure to consistently turn in his assignments, and a perceived lack of effort. (AR 501.) His grades were mostly Ds and Fs for 9th grade and all Fs for 11th grade. (AR 501.) Dr. Jackson-Salcedo found no indication in Plaintiff's school records that he participated in special education classes or that an individualized educational program ("IEP") was ever developed for Plaintiff. (AR 501.) Plaintiff has no relevant work history, even prior to his head injuries, and he lives at home with his mother. At least two mental health professionals opined that Plaintiff was unable to manage his own funds. (AR 339, 528.) All the examining psychologists noted Plaintiff's poor academic performance prior to his injuries (AR 337, 367, 501, 522, 728), that Plaintiff did not finish high school (AR 337, 366, 501, 522, 728), that he never had significant employment as an adult either before or after his brain injury (AR 337, 370, 502, 523, 728), and that he has not lived independently but instead has lived with his mother (AR 510), his sister (AR 29), or a family friend (AR 365). This constitutes substantial evidence of deficits in adaptive functioning that manifested before Plaintiff reached the age of 22. As such, this prong of 12.05(C) is satisfied.

### 4. Listing 12.05 Does Not Require Diagnosis of "Mental Retardation"

Although the ALJ noted that none of Plaintiff's treating psychiatrists diagnosed Plaintiff on Axis II, a diagnosis for mental retardation is not necessary to meet the requirements of 12.05(C). Rather, Listing 12.05 "relies instead on valid IQ scores in conjunction with other evidence to establish 'subaverage general intellectual functioning.'" *Huber*, 2011 WL 1004936, at *2 (D. Ariz. Mar. 22, 2011) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05). Moreover, several examining physicians did render Axis II diagnoses including academic delay in the moderate to severe range (AR 527), and borderline intellectual functioning (AR 509).

### D. Remand for an Award of Benefits is Required

As set forth above, substantial evidence supports a finding that Plaintiff meets all three of the requirements under Listing 12.05(C) and is presumptively disabled at the Third Step of the

1  sequential evaluation.  Remand for an award of benefits is appropriate when (1) the ALJ has failed

2  to provide legally sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding

3  issues that must be resolved before a determination of disability can be made; and (3) it is clear from

4  the record that the ALJ would be required to find the claimant disabled if he considered the

5  claimant's evidence.  *See Massanari*, 298 F.3d at 1076-77.

6      The Court notes that this case has a particularly troubling procedural history.  For the ten

7  years during which this case was pending before the agency, Plaintiff's counsel consistently asserted

8  that Plaintiff meets the requirements of Listing 12.05(C).  Despite this, after three hearings before

9  two different ALJs, three separate written decisions, and two separate directives from the Appeals

10  Council to consider Listing 12.05(C), no consideration of Listing 12.05(C) was ever undertaken.

11  As stated in *Benecke*,

12      [a]llowing the Commissioner to decide the issue again would create an unfair 'heads
       we win; tails, let's play again' system of disability benefits adjudication.  Requiring
13      remand for further proceedings any time the vocational expert did not answer a
       hypothetical question addressing the precise limitations established . . . would
14      contribute to waste and delay and would provide no incentive to the ALJ to fulfill her
       obligation to develop the record.

15  *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004).  The Commissioner has had ten years and

16  multiple opportunities to address Listing 12.05(C), but has failed to do so.  The evidence has been

17  fully developed as five examining psychologists have conducted testing and provided evaluations

18  of Plaintiff's impairments.  Even if Listing 12.05(C) were given specific and express consideration

19  by any ALJ on remand, a finding that Plaintiff does *not* meet Listing 12.05(C) would not be

20  supported with substantial evidence.  Rather, the overwhelming majority of the evidence indicates

21  that Plaintiff does meet Listing 12.05(C).

22      The Court need not address the remainder of the parties' arguments as they relate to the ALJ's

23  consideration of the evidence in subsequent steps of the sequential analysis, and they do not impact

24  whether Plaintiff is entitled to presumptive disability at the Third Step.  Where the claimant is found

25  disabled or not disabled at any particular step, the disability determination is made at that step, and

26  the sequential evaluation process ends.  20 C.F.R. § 416.920(a)(4).

27

28

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for calculation and award of benefits.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Johnathon E. Taylor and against Defendant Michael J. Astrue, Commissioner of Social  Security.


IT IS SO ORDERED.

**Dated:    September 9, 2011          /s/ Sheila K. Oberto          **
UNITED STATES MAGISTRATE JUDGE